IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILMA NALLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:16-cv-391-WHA-SRW |
| | ) | (WO) |
| CORIZON HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

This cause is before the court on a Motion for Summary Judgment (Doc. # 14) by Defendant Corizon Health, Inc. ("Corizon"), together with supporting and opposing briefs and exhibits.

Nalls filed a Complaint on May 31, 2016 (Doc. # 1), alleging race and age discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., respectively. Specifically, Nalls brings claims of hostile work environment (Count I), disparate treatment (Count II), age discrimination (Count III); and retaliation (Count V).

On June 5, 2017, Corizon filed a Motion for Summary Judgment (Doc. # 14) on all of Nalls's claims. Subsequently, Nalls responded (Doc. # 18), and Corizon replied (Doc. # 22). For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED, in part, and DENIED, in part.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id*. at 324.

Both the party "asserting that a fact cannot be" and the party asserting that a fact "is genuinely disputed" must support their assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include: "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III.  FACTS

The facts before the court, viewed in the light most favorable to the Plaintiff, are as follows:

Nalls is a 70-year-old, black female. She has been a registered nurse since 1990. (Doc. # 19-1, p. 8:11–8:15; 12:13–12:15). In 2005, Prison Health Services, which later became Corizon, hired Nalls to work the day shift as a charge nurse.  (Doc. 19-1, p. 12:16–12:23). As a charge nurse, Nalls worked in the infirmary and in the emergency room. Her regular duties included paperwork, checking charts for audits, prison inspections, making assignments for other nurses, keeping up with inventory of needles and syringes, and "whatever needed to be done." (Doc. # 19-1, p. 70:18–71:14); (Doc. # 19-2, p. 6:18–7:4; 21:1–21:14; 41:1–41:10)

Nalls reported to the Director of Nursing ("DON"); and the DON reported to the Health Services Administrator ("HSA") (Doc. # 19-1, p. 53:8–54:14). On July 7, 2014, Jessica Duffell ("Duffell") was hired at Corizon as the HSA. (Doc. # 19-7, p. 6:9–6:15). In October 2014, Corizon hired Dorothy Price ("Price") as DON. (Doc. # 14-3, p. 6:2–6:9).

Just after Duffell was hired, Nalls overheard Duffell on the telephone stating that "there were more black nurses and only two white nurses, and she was afraid of reverse discrimination, and there are too many of y'all." (Doc. # 19-1, p. 54:16–20). When Nalls heard Duffell's remark, she responded that she did not like that word 'y'all.' "What do you mean y'all?" She told Duffell that she believed the term was a "racial statement" that was "obviously prejudicial." (Doc. # 19-1, p. 61:1–61:14). Nalls further told Duffell that her previous HSA did not have a problem with

3

there being more black nurses than white nurses, to which she responded "he is not here now."

(Doc. # 19-4, p. 3).

Then, in 2015, when Duffell was either 68 or 69-years-old, Duffell made other comments that Nalls found offensive. Duffell testified in her deposition that:

> A. "Now, she kept saying stuff like, I just looked at your chart -- I mean looked at your record, how old are you? I said, well, if you looked at my record, you already know how old I am. How do you make so much money? I said I've been here ten years, I get incentive raises every year. And one year the administrator thought I was really Cracker Jack, and he gave me an extra over -- across-the-board raise. She said: Hmm, don't you have grandchildren? I almost said none of your business, but I didn't. I was polite, I said yes, I do. Well, don't you need to be at home with your grandchildren? Are you drawing your Social Security too, Miss Rich? Don't you need to be at home with your grandchildren? She just really pushed all kinds of buttons with me, because she was out of her place. So I –
>
> Q. What do you mean out of her place?
>
> A. Asking me those questions.
>
> Q. Oh, you mean that was none of her business?
>
> A. Thank you. She went right over the cup of tea, right over the top. You know when you pour so much and the cup runs over? Now, this was not -- This is not a professional question. We were not -- I could have a -- I had had a more casual conversation with Dorothy Price than I had ever had with Ms. Duffell, and she just went right over the top. Then she said things like, well, I know what I'm going to call you since you got grandchildren and you just insist on working, I'm going to call you Nana Nalls. I said my name is Ms. Nalls; my grandchildren don't call me Nana. Well, I'm going to call you Nana. And that's what she called me from then on.

(Doc. # 19-1, p. 108:18–110:12). In March 2015, Nalls objected to Duffell for calling her "Nana," because she believed it was offensive. She told Duffell, "None of my children, grandchildren, or anybody called me Nana. That sounds like an old-timey, excuse my French,

white name from when they used to have nannies and mammies to take care of the children, they called them Nana. I am not that." (Doc. # 19-1, p. 112:9–112:14). Nevertheless, even after Nalls objected, Duffell continued calling her "Nana" both to her face and in front of other employees. (Doc. # 19-1, p. 113:6–113:8; 121:7–121:8). One of her coworkers, Dawn Young, overheard Duffell calling Nalls "Nana" "[m]aybe about two times." (Doc. # 19-2, p. 56:3–57:3)

Additionally, after Nalls objected, Duffell responded, "Since you are so smart, why don't you stay in the back of the infirmary and don't come back here until we need you." (Doc. # 19-1, p. 121:3–121:8). Nalls was thereafter assigned to work in the Infirmary, where she would work until she was fired in May 2015.

While working in the Infirmary, Nalls was responsible for feeding and cleaning nine older, heavier men. (Doc. # 19-1, p. 142:4–142:9). Nalls complained that she needed help with these responsibilities, but Duffell responded, sarcastically, "You're so smart and know everything, I'm sure you can handle it. And walked away." (Doc. # 19-1, p. 146:6–11). Nalls also asked for a Hoya lift and a hospital bed, but her request was denied. (Doc. # 19-1, p. 148:20–22). Although other nurses were assigned to work in the Infirmary, (Doc. # 19-7, p. 33:22–34:22), (Doc. # 14-3, p. 14:6–15:1), at that point, Nalls believed Duffell was doing everything she could to try and make Nalls quit.

On May 8, 2015, Nalls injured her back lifting a patient off of his bed. (Doc. # 19-10); (Doc. # 19-21)[1]. Duffell drove Nalls to the hospital. On their way to the hospital, Duffell told Nalls, "you're too old for this. You need to draw your Social Security, and stay home with your

_____

[1] The OSHA form Nalls submitted into evidence shows that Nalls injured her back on May 4, 2015. (Doc. # 19-10) However, the Bullock County Hospital Emergency Department records show a discharge date of May 8, 2015. (Doc. # 19-21). Nalls argues that her injury occurred on May 8, 2015. Therefore, for purposes of this opinion, construing the evidence in the light most favorable to the plaintiff, the court understands Nalls's injury to have occurred on May 8, 2015.

grandchildren." (Doc. # 19-1, p. 159:1–159:12). Later on, Duffell called Nalls and told her that she had to be back at work on Monday or else she would be fired. (Doc. # 19-1, p. 164:7–165:8). Over the weekend, it became clear that she would not be able to make it into work on Monday. She called and left a message on the answering machine saying that she could not make it to work on the following Monday because she was still under her doctor's care. (Doc. # 19-1, p. 164:19–165:2).

Meanwhile, prior to Nalls's injury, Price and Duffell had begun an investigation into allegations that Nalls had violated a workplace rule prohibiting inmate runners from performing skilled nursing tasks. The investigation began when Leo Nunez ("Nunez"), an inmate at Bullock Correctional Facility and a runner assigned in the Infirmary, under the supervision of Nalls, reported to Price that he was concerned about another patient's blood pressure. When Price asked why he was concerned about another inmate's vitals, Nunez responded, "well, because I've been taking it, you know, and its been high and it hasn't been high." (Doc. # 19-7, p. 107:9–107:15). This raised Price's suspicion that Nalls was inappropriately delegating skilled nursing tasks to untrained inmates. Accordingly, Price began an investigation.

Corizon's personnel and training manual provides that "Inmates do not provide health care services." (Doc. # 14-7, p. 28). It further provides, in relevant part, that "(1) Inmates do not make treatment decisions or provide patient care. (2) Inmates do not . . . or handle medical records, medications, or surgical instruments and sharps." *Id*. A discussion of the intent of this work rule is that "the health services are provided by health staff are not substituted with inmates workers." *Id*. Finally, an employer manual provided by the Alabama Department of Corrections explicitly states that employees shall not "Direct inmates to provide direct patient care. Inmates are to be used only as custodians in the hospital area." (Doc. # 14-7, p. 32).

After Nunez reported that he had been taking another inmate's blood pressure, Price and Duffell began an investigation, including collecting written statements from other inmates and nurses, to determine whether it was true—and, ultimately, whether to fire Nalls. First, Duffell and Price corroborated Nunez's story with another inmate, Kevin Vines ("Vines"), who was also assigned as a runner in the Infirmary. (Doc. # 19-7, p. 110:15–111:2). Additionally, Vines informed them that other nurses in the Infirmary were aware that Nalls was having runners take vital signs from inmates in the infirmary. (Doc. # 19-7, p. 108:21–108:23).

In response to these allegations, Duffell organized a meeting with her staff to explain what inmate runners are allowed to do—and what they are not allowed to do. After the meeting, some of the nurses independently came to Duffell to report that Nalls was having inmate runners take vital signs of the other inmates. Duffell then instructed them to "write me a statement." (Doc. # 19-7, p. 113:11–114:1).

On May 14, 2015, Duffell and Price received written statements from Pauline Perryman, RN, LPN; and Marty Thomley, LPN, confirming that Nalls had ordered inmates to take vitals from inmate patients. Additionally, inmates Nunez and Vines did the same. On May 16, 2015, Edwanna McNeil, LPN wrote a similar statement. After gathering all of those statements, Duffell and Price wrote a formal recommendation to fire Nalls and Price submitted them to Corizon's Human Resources Department. (Doc. # 19-7, p. 114:2–115:20).

The Human Resources Department reviewed all of the documentary evidence. After their review, Dan Burchfield, the Human Resources Manager, contacted Duffell to request more information. (Doc. # 14-7, p. 34). Duffell and others continued sending more information to Corizon's Human Resources Department. After at least a week of gathering information and in collaboration with Corizon's upper management personnel, Corizon concluded that Nalls had

violated official policies and procedures, namely, that she had directed inmates to perform skilled nursing tasks, and made the decision to fire Nalls. (Doc. # 14-7, p. 6–7, ¶ 23–25). Subsequently, Nalls was fired.

## IV. DISCUSSION

Nalls brings claims for hostile work environment under Title VII (Count I), disparate treatment on the basis of race under Title VII (Count II), age discrimination under the Age Discrimination in Employment Act ("ADEA") (Count III), and retaliation under Title VII and the ADEA, respectively, (Count V).[2] Corizon has filed a Motion for Summary Judgment (Doc. # 14) as to all of Nalls's claims, arguing there is no genuine dispute of material fact and that Corizon is entitled to judgment as a matter of law. The court will address each of Nalls's claims, in turn.

### A. Hostile Work Environment (Count I)

Nalls brings a hostile work environment claim under Title VII. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

To establish a hostile work environment claim under Title VII, a plaintiff must prove that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and quotations omitted). In doing so, the plaintiff must show: (1) that she belongs to a protected

---

[2] There is no Count IV in the Complaint.

group; (2) that she was subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee, such as race or national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

In this case, Corizon moves for summary judgment on Nalls's hostile work environment claim, arguing that Nalls has not produced sufficient evidence to satisfy the third and fourth elements listed above—that the alleged harassment was based on her race and was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. This element has both an objective component and a subjective component. *See Harris*, 510 U.S. at 21–22. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Miller*, 277 F.3d at 1276 (internal citations and quotations omitted; alterations incorporated).

Before determining whether Corizon's conduct was subjectively or objectively hostile or abusive, however, the court will addresss which conduct—among all the conduct Nalls found objectionable—qualifies as racially hostile or abusive for purposes of a hostile work environment claim.[3] First, the court finds that a reasonable juror could determine Duffell's use of the term

---

[3] Most of Nalls's complaints are irrelevant to her hostile work environment claim. The Eleventh Circuit has made clear that "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000, *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Accordingly, Nalls's complaint that Duffell humiliated her by saying that "since she was so smart she could go in the back and not come out unless asked;" that Duffell did not

"Nana," under the circumstances of this case, to be racially derogatory. *See* (Doc. # 19-1, p. 113:6–115:2). While the term "Nana" may be a race-neutral term in other contexts, because Duffell continued calling her "Nana" after she objected to Duffell for doing so and explained that no one called her that and she interpreted "Nana" as an old term used by white children to refer to their black caregivers, a reasonable juror could find the continued use of the term "Nana" to be racially offensive. *See Ambus v. Autozoners, LLC*, 938 F. Supp. 2d 1225, 1237 (M.D. Ala. 2013) (Albritton, J.) ("Words that do not reference race directly can sometimes constitute racial harassment if they are shown to have a connection with race." (citing *Rogers v. Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993)).

In addition, the court finds that Duffell's statement that there were too many black nurses could be reasonably interpreted as objectively racially hostile or abusive. Even though Nalls has not presented any evidence that Duffell directed the statement towards Nalls—in fact, she claims she merely overheard Duffell say it to someone while on the telephone—the Eleventh Circuit has held that certain derogatory comments in the workplace made about a protected class as a whole may support a hostile work environment claim, regardless of whether they specifically target the individual asserting that claim. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010). The critical issue in the Title VII context is whether employees are exposed to more disadvantageous terms or conditions of employment as a result of their membership in a

---

provide her assistance when asked; that Nalls was removed from her floating charge nurse duties; that Duffell watched over Nalls; that other employees were called into Duffell's office to report on Nalls; that Duffell failed to get Nalls the equipment she needed when she asked for it; that Duffell insulted Nalls's intelligence; that Duffell laughed at Nalls; that Duffell stated "oh, we're killing Ms. Nalls, we're killing Ms. Nalls;" and that Duffell allegedly made up reasons to fire Nalls; all are irrelevant to her hostile work environment claim because she has not pointed to any evidence sufficient to allow a reasonable juror to conclude that they are based on Nalls's race—or any other protected class.

protected class than those who are not members of that protected class. *See generally Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (referring to sex discrimination).

Accordingly, Nalls's hostile work environment claim is premised on being called "Nana" by her supervisor after objecting to the term as a racial comment and overhearing her supervisor remarking that there are too many black nurses. After considering the evidence, the court finds that a reasonable juror could conclude that Nalls was the victim of a racially hostile work environment.

To begin with, there is no dispute that Nalls subjectively perceived Duffle's actions and remarks to be hostile or abusive. Nalls testified that she believed the name "Nana" was racially "offensive," told Duffell so, and Duffell continued to call her that. (Doc. # 19-1, p. 112:23). In addition, Nalls claims that she perceived Duffell's comment that there were too many black nurses and only two white nurses to be "a racial statement" that was "[o]bviously prejudice[ial]." (Doc. # 19-1, p. 61:11–13). Accordingly, because there is no dispute that Nalls believed Duffell's remarks were offensive, the court will focus on the objective component: whether, based on the evidence viewed in a light most favorable to the plaintiff, a reasonable juror could find that Duffell's treatment of Nalls was hostile or abusive.

The Eleventh Circuit considers several factors in making this objective determination: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). Moreover, the Eleventh Circuit recognizes that, in making this objectiveness determination, the court should consider the totality of the circumstances, not any one single factor. *Miller*, 277 F.3d at 1276. Applying that

framework in the present case, the court finds that Nalls has presented sufficient evidence from which a reasonable juror could find that Duffell's treatment of Nalls was hostile or abusive.

First, a reasonable juror could find Duffell's conduct was sufficiently frequent. Nalls states that she overheard Duffell state there are "too many black nurses" one time. Additionally, Nalls testified that Duffell called her "Nana" over her objection many times over a six to eight week period. (Doc. # 19-1, p. 110:10–13; 120:22–122:4; 133:9–20). While it is unclear from the record exactly how many times Duffell called Nalls "Nana," Nalls argues that it happened on a daily basis. Nalls testified in her deposition she was called "Nana" at least twice, initially: once before and once after she objected to Duffell for doing so; and then that Duffell continued to call her "Nana" "from then on." (Doc. # 19-1, p. 110:5–13). While Duffell acknowledges that she called Nalls "Nana," she claims that she only did so once. (Doc. # 19-7, p. 36:10–23). Additionally, Young testified that she only heard Duffell call Nalls "Nana" "[m]aybe about two times" over the course of "two years." (Doc. # 19-2, p. 55:16–57:3). However, at this stage, viewing the evidence in the light most favorable to the plaintiff, a reasonable juror could find that Duffell's multiple racially-charged comments were sufficiently frequent for purposes of a hostile work environment claim. *See Reeves*, 594 F.3d 798 (11th Cir. 2010) (finding derogatory comments made "on a daily basis" to be sufficiently frequent); *Miller*, 277 F.3d 1269 (finding ethnic slurs hurled at the plaintiff "three to four times a day" over a one month period to be sufficiently frequent); *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417 (11th Cir. 1999) (finding "almost daily abuse" to be sufficiently frequent).

Second, a reasonable juror could find Duffle's conduct was severe. While the determination of the frequency depends upon the number of hostile or abusive incidents over a given time period, the severity of such conduct depends upon its relative degree. *See Harris*, 510

U.S. at 21 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." (internal citations omitted)). In this case, as previously noted, Nalls has presented evidence that Duffell made multiple—perhaps daily—racially charged remarks over the course of six to eight weeks. Additionally, Duffell continued making those remarks over Nalls's objections. *See Miller*, 277 F.3d at 1276 (noting that it is 'repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment' and not simply some 'magic number' of racial or ethnic insults." (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)). Because Nalls objected to Duffell for calling her "Nana" and explained to Duffell that she believed that that was "what white children called their black caretakers," (Doc. # 19-4, p. 2, ¶ 3), the court cannot conclude that Duffell's comments amounted to nothing more than "simple teasing, offhand comments, and isolated incidents," which would not support a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Rather, they are indicative of the type of workplace abuse that Title VII is designed to remedy. Accordingly, a reasonable juror could find Duffell's comments sufficiently severe for purposes of her hostile work environment claim.

Third, Nalls's testimony clearly reveals that Duffell's comments were humiliating or degrading. Duffell's comments were directed at Nalls, specifically. Additionally, these were not simply comments made between coworkers; Duffell was Nalls's direct supervisor. And, Duffell called Nalls "Nana" in front of her coworkers. *See Miller*, 277 F.3d 1269, 1277 (11th Cir. 2002) (considering the nature of the utterances, that they were directed at the plaintiff, and were sometimes used in the course of reprimanding him in front of others sufficient to establish

comments were humiliating or degrading); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (considering the fact that the conduct was attributable to the plaintiff's supervisor in determining whether it was humiliating). Furthermore, as mentioned previously, Nalls was not a willing participant to—or silent about—Duffell's name-calling. Nalls objected to Duffell calling her "Nana," and Duffell continued to do so, over her objections. *See Buckhanon v. Huff & Associates Const. Co., Inc.*, 506 F. Supp. 2d 958, 967–68 (M.D. Ala. 2007) (Watkins, J.) (considering the fact that the plaintiff did not complain about a co-worker's—not a supervisor's—use of a racial epithet and that it was not directed at the plaintiff to find a co-worker's conduct insufficiently humiliating). Considering the context of these statements, it is clear that Duffell's comments were humiliating and degrading to Nalls.

Fourth, although Duffell's behavior did not prevent Nalls from performing the duties of her employment, this factor alone is not fatal to her hostile work environment claim. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11th Cir. 2014) (recognizing the viability of several plaintiffs' hostile work environment claims without acknowledging proof of each of the *Miller* factors as to each plaintiff); *Hulsey*, 367 F.3d at 1248 (11th Cir. 2004) ("In considering [the *Miller*] factors, we employ a totality of the circumstances approach, instead of requiring proof of each factor individually."). Therefore, even though Nalls testified in her deposition that she was still able to do her job after Duffell made the offensive comments, Nalls's hostile work environment claim survives summary judgment on the backs of the other three *Miller* factors.

Accordingly, viewing the evidence in a light most favorable to Nalls and considering the totality of the circumstances, the court finds that a reasonable juror could determine that Duffle's treatment of Nalls was sufficiently severe or pervasive as to alter the terms and conditions of employment and create a discriminatorily abusive working environment based on race.

Accordingly, Corizon's Motion for Summary Judgment with respect to Nalls's hostile work environment claim is due to be DENIED.

## B. Disparate Treatment (Count II)

Nalls brings a disparate treatment on the basis of race claim under Title VII. "Disparate-treatment cases present the most easily understood type of discrimination, and occur where an employer has treated a particular person less favorably than others because of a protected trait. A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

A plaintiff may establish a claim of illegal discriminatory intent or motive through either direct evidence or circumstantial evidence. *Schoenfeld v. Babbitt*, 168 F.3d 1257 (11th Cir. 1999). Where, as here, the plaintiff seeks to demonstrate discriminatory intent on the basis of circumstantial evidence, the court employs the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under that framework, the plaintiff must establish a prima facie case of discrimination. *See Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *See id.* "If the employer articulates a legitimate, nondiscriminatory reason for its actions, 'the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext of illegal discrimination.'" *Id.* (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

### 1. Prima Facie Case

"To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). In this case, there is no dispute that Nalls meets the first, second,[4] and fourth elements of her prima facie case. The parties do disagree, however, as to whether the third element—whether her employer treated similarly situated employees outside of her protected class more favorably than she was treated—is met.

When a plaintiff alleges she was treated more unfavorably than similarly-situated employees in the application of discipline for violation of work rules, she must show "either (a)

---

[4] Nalls meets the second prong because she was fired. She also complains that she "was placed in the back by herself, where it is far more strenuous[;] her floating duties were taken away[;] she was not provided any help[;] and in fact, the LPN assigned to the back, Marty Thomley[,] was directed not to provide Nalls help[;] she was not provided proper equipment; [Duffell] did not provide her medical leave[;] . . . [and Duffell] falsified write ups for being unprofessional towards inmates." (Doc. # 18, p. 20). These complaints, which fit into one of two general categories: (1) that she was reassigned to work in the Infirmary; and (2) that she had different job responsibilities when she worked there; do not amount to adverse employment action. The Eleventh Circuit in *Davis v. Town of Lake Park* explained that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." 245 F.3d 1232, 1238 (11th Cir. 2001). Instead, an adverse employment action is one that causes "a significant change in employment status," such as "reassignment with *significantly* different responsibilities." *Id.* at 1239 (emphasis original). When a reassignment involves no "*serious and material* change in the terms, conditions, or privileges of employment," however, a court should not act as a "super-personnel department" by questioning an employer's business judgment about where it assigns its employees and which tasks they are required to perform. *Id.* at 1239, 1244 (emphasis original). Here, Nalls has failed to present sufficient evidence from which a reasonable juror could find that her reassignment resulted in a serious or material change in the terms, conditions, or privileges of her employment. Although her reassignment may have resulted in decreased responsibility or prestige, those changes were insubstantial and are more typical of the ordinary incidents of employment employees face when they move from one assignment or area to another. Accordingly, the court will not consider these actions to be adverse for purposes of her disparate treatment claim.

that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar conduct." *King v. Butts Cty. Ga.*, 576 Fed. App'x. 923, 928 (11th Cir. 2014) (quoting *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989)). In this case, Nalls argues that she satisfies both.

First, Nalls argues that she was treated more unfavorably than similarly situated employees. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("To make a comparison of the plaintiff's treatment to that of [male] employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects."). Corizon argues that Nalls has failed to identify a similarly-situated comparator outside of her protected class who was treated more favorably than she was in the application of work rules. The court agrees.

In cases of alleged official policy violations, the Eleventh Circuit has required comparators to have committed virtually the same types of violations, the same amount of times. *See Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999). In *Maniccia*, a female police officer filed a sexual harassment complaint against a male coworker. Eight months later, the male coworker filed four formal charges against the female officer, including: (1) unauthorized use of confidential driver's license information; (2) lying about using confidential driver's license information; (3) unauthorized transportation of a passenger; and (4) lying about the unauthorized

transportation of a passenger. The female officer was subsequently fired. After being fired, the female officer filed a complaint, alleging disparate treatment against her coworker and supervisor. To prove her claim, she made the following evidentiary showings: (1) three male officers had carried unauthorized passengers, but were not fired; (2) four other male officers had lied about carrying unauthorized passengers, but were not fired; and (3) one male officer had been convicted of a crime, but had not been fired. Nevertheless, the district court granted summary judgment in the coworker's and supervisor's favor, because the female officer had failed to prove a prima facie case of disparate treatment; namely, she failed to present evidence of a similarly situated comparator. The district court concluded that there were "several magnitudes of difference" between the female officer's misconduct and the male officer's misconduct.

On appeal, the female officer argued that the district court erred in its determination that she had not presented evidence of a similarly situated comparator. The Eleventh Circuit disagreed, reasoning that in the employee misconduct context, "[w]e require that the quantity and quality of the comparator's misconduct be *nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id*. at 1368. The court went on to distinguish her misconduct from the misconduct of the other officers that she claimed qualified as comparators. As to the first group, the court explained that, although three officers had carried unauthorized passengers, as the female officer had done, there was no evidence that any of them had lied about doing so. As to the second group of officers, the court found that, although they had lied about carrying unauthorized passengers, there was no evidence that any of the four had ever lied repeatedly under oath, as the female officer had done. Finally as to the last officer, the court found that, although he had been convicted of a crime but had not

been fired, there was no evidence that the officer had ever committed any workplace misconduct. Finally, the female officer did not present any evidence of any other officer who had ever used confidential driver's license information or lied about doing so. Therefore, the court found that the female officer "failed to meet her burden of pointing to a male employee who engaged in the same or similar misconduct." *Id*. at 1369. In other words, she could not prove her disparate treatment claim, because she could not show that she had been treated less favorably than a similarly situated employee—a comparator—outside of her protected class.

Likewise, Nalls's disparate treatment claim fails on that basis because she has failed to present any evidence of a valid comparator. Corizon claims that it fired Nalls because she directed inmate runners to perform skilled nursing tasks in the Infirmary in violation of official Corizon policy. However, Nalls has not shown that, in being fired, she was treated differently than any other employee. Like the female officer in *Maniccia*, Nalls has not shown that any other nurse working for Corizon directed inmate runners to perform skilled nursing tasks, but was treated differently than she was. In fact, unlike the officer in *Maniccia*, who at least pointed to some coworkers who committed some of the same types of violations that she did, Nalls has failed to present any evidence of *any* employee, whether in her protected class or not, who violated *any* official Corizon policy, but was treated more favorably than she was.

Instead, Nalls's disparate treatment claim rests on the assertion that she was treated less favorably *overall* than her white coworkers. She states, "RN, O'Quinn, and the white RN's that were hired after Nalls, were not solely assigned to the back[.] [O'Quinn's] duties floated as did all the other RN's[.] [H]e was provided help[. A]nd he was provided a hospital bed upon request. Marty Thomley and O'Quinn were both provided medical leave and not terminated. All of the staff was repeatedly counseled during staff meetings regarding their professionalism toward

inmates, and Nalls was the only employee terminated for this reason." (Doc. # 18, p. 21). In essence, Nalls's disparate treatment claim rests on the notion that it was unfair that her coworkers had an easier job than she had. Such an argument is insufficient as a matter of law to state a claim for disparate treatment under Title VII.

In the alternative, Nalls argues that she was the victim of disparate treatment because she did not violate Corizon's official policy. She argues that any report claiming she violated Corizon's official policy was "clearly false and pretext." (Doc. # 18, p. 23). She presents her own testimony to establish that she did not engage in the conduct which Corizon has pointed to as a violation of the work rule. Therefore, the court assumes for purposes of analysis that she did not violate the work rule. The burden shifts to the employer to articulate a legitimate nondiscriminatory reason for her firing. *See Jones*, 874 F.2d at 1540 (11th Cir. 1989) (proceeding along the *McDonnell Douglas* pathway where plaintiff claimed that she did not violate a work rule, which was the employer's stated basis for his firing).

### 2. Legitimate Nondiscriminatory Reason

Corizon contends that it fired Nalls because she violated a work rule; specifically, Corizon contends that Nalls improperly directed inmates to perform skilled nursing tasks. Corizon's personnel and training manual provides that "Inmates do not provide health care services." (Doc. # 14-7, p. 28). It further provides, in relevant part, that "(1) Inmates do not make treatment decisions or provide patient care. (2) Inmates do not . . . handle medical records, medications, or surgical instruments and sharps." *Id*. A discussion of the intent of this work rule is that "the health services are provided by health staff are not substituted with inmates workers." *Id*. Finally, an employer manual provided by the Alabama Department of Corrections explicitly states that employees shall not "Direct inmates to provide direct patient care. Inmates are to be

used only as custodians in the hospital area." (Doc. # 14-7, p. 32). In this case, Duffell and Price investigated a claim that Nalls was directing inmates to provide skilled nurse tasks, and ultimately recommended to their superiors at Corizon that she be terminated based on the stated reason that "Nalls has been allowing inmate 'runners' to do patient care to include . . . taking vital signs on all of the inmates housed in the infirmary at Bullock Correctional Facility. These inmates were not given any training to do tasks that only a licensed nurse should do. Ms. Nalls delegated skilled nursing tasks onto unlicensed personnel." (Doc. # 14-7, p. 41).

Accordingly, because violations of work rules constitute legitimate, nondiscriminatory reasons to terminate an employee, *see Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999), Corizon has presented a sufficient legitimate nondiscriminatory reason for firing Nalls. *See also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (holding an employee may be fired "for good reason, bad reason, reason based on erroneous facts, or no reason at all, so long as its action is not for a discriminatory reason"). Now, the burden shifts back to Nalls to show that the stated reason for her firing was pretext.

### 3. Pretext

In determining whether Corizon's stated reason for firing her was pretext, the court need not determine the validity of Nalls's argument that she did not violate the work rule. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which [s]he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones*, 874 F.2d at 1540; *Bush v. Houston Cty. Comm'n*, 414 Fed. App'x. 264, 267 (11th Cir. 2011) (noting when an employee asserts that she did not violate a work rule, "the ultimate issue is whether the decisionmaker believed that the employee violated the rule, not whether the employee actually violated the rule"

(citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 136 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.") In other words, "if an employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race.'" *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987).

In this case, nothing in the record suggests that Corizon did not reasonably fire Nalls based on the results of their independent investigation. Stated differently, Nalls has not shown that Corizon did not have a good faith belief that Nalls violated its official policy when it fired her. Nalls attempts to rebut the fact that Corizon had a good faith belief that Nalls violated its official policy by claiming that Corizon's upper management and Human Resources Department were merely a "cat's paw" for Duffell, who recommended her termination. However, even under this theory, Corizon would be entitled to summary judgment.

Under a cat's paw theory, "an employer could be liable when the decision-maker has no [retaliatory] animus but is influenced by a subordinate supervisor's action that is the product of such [retaliatory] animus." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013). For example, when "the decisionmaker follow[s] [a] biased recommendation without independently investigating the complaint against the employee[,] . . . the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). On the other hand, where the decision maker independently investigates the charges of misconduct against the employee and, based upon that investigation, finds that the employee is

guilty of the misconduct, the "causal link" between the discriminatory animus and the adverse employment action is "broken" by the decision maker's independent decision. *Id.* at 1331.

In this case, no evidence suggests that Corizon's upper management or Human Resources Department relied *solely* on Duffell's and Price's recommendation to fire Nalls. *See Lawson v. KFH Industries, Inc.*, 767 F. Supp. 2d 1233, 1246 (M.D. Ala. 2011) (Albritton, J.) (rejecting a disparate treatment claim because the plaintiff failed to show that his employer relied solely on witness statements or recommendations from lower level employees who may have harbored discriminatory animus against him, but instead relied on the findings of its independent investigation, in its decision to terminate the plaintiff). Rather, the evidence shows that after inmate Nunez complained to Price, not Duffell, that he believed another inmate's blood pressure was too high, Price initiated an investigation. (Doc. # 19-7, p. 107:3–108:7). After investigating and corroborating Nunez's complaint from other inmates and obtaining statements from several other nurses and Nalls's coworkers, including a recommendation for termination from Duffell, the information was passed on to Corizon's upper management and Human Resources Department. In reliance on those reports of misconduct from multiple inmates, coworkers, and supervisors, Corizon made the decision to fire Nalls.

Nalls argues that Corizon's upper management relied on Duffell's recommendation in its decision to fire her, and, therefore, that it was a cat's paw to Duffell's racial animus. However, the evidence shows that, while Corizon may have *considered* Duffell's recommendation in its decision to fire Nalls, it only did so in conjunction with upper management's additional consideration of Price's recommendation and review of the extensive investigation of the facts surrounding Nalls's official policy violation and statements from inmates and nurses. *See Foster v. Mid State Land & Timber Co., Inc.*, No. 2:06cv405, 2007 WL 3287345, *17 (M.D. Ala. Nov.

5, 2007) (Dement, J.) (noting "the cat's paw theory prohibits a decisionmaker from accepting a racially-biased recommendation only when the decisionmaker fails to independently evaluate the recommendation" (citing *Roberts v. Randstad North Am., Inc.*, 231 Fed. App'x. 890, 896 (11th Cir. 2007)). Moreover, as Corizon correctly notes, it began its investigation into Nalls's alleged misconduct only after DON Price was informed of her misconduct by a third party, inmate Nunez—not Duffell—and after it corroborated Nunez's report with another inmate, Vines. (Doc. # 19-7, p. 110:15–111:2); (Doc. # 19-7, p. 107:3–108:7). These facts show that it was Corizon's independent investigation, and not Duffell's recommendation, that led to Nalls's firing.

Accordingly, Corizon's independent investigation "broke the chain" of causation between any discriminatory animus Duffell may have harbored against Nalls and its ultimate decision to fire her. *See Caldwell v. Clayton Cty. School Dist.*, 604 Fed. App'x. 855, 861 (11th Cir. 2015) (stating "where the 'decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee'" (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001)). In other words, because Corizon's upper management and Human Resource Department conducted its own investigation of the facts underlying Nalls's alleged official policy violation and found that her termination was entirely justified, it cannot be said that Duffell's discriminatory animus in making a recommendation to fire Nalls—to the extent that there was any—was a motivating factor in Nalls's termination. *See Brooks v. Hyundai Motor Mfg. Ala., LLC*, 444 Fed. App'x. 385, 388 (11th Cir. 2011) (discussing *Staub*'s reach in a Title VII disparate treatment claim; noting that a similar independent investigation fell within the following language of *Staub*: "But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account *without determining that the adverse action was, apart from the supervisor's*

*recommendation, entirely justified*. 131 S.Ct. at 1193 (emphasis added)); *see also Stimpson*, 186 F.3d at 1331 ("When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee.").

Corizon's Motion for Summary Judgment is, therefore, due to be GRANTED as to Nalls's disparate treatment claim.

## C. Age Discrimination (Count III)

Next, Nalls brings a claim of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq. (Doc. 1, p. 1 ¶2). The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age. 29 U.S.C. § 623(a)(1), 631(a). The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In *Gross v. FBL Financial Services, Inc.*, the Supreme Court found that the language "because of" requires proof that age was the "but-for" cause of an employee's discharge. 557 U.S. 167, 176 (2009) ("noting that age must have "had a determinative influence" on the employer's decision to fire an employee). In this case, Nalls's claim of age discrimination is based upon circumstantial evidence. Therefore, the court will employ the flexible *McDonnell Douglas* burden shifting approach to Nalls's age discrimination claim. *See Trask v. Secretary, Dept. of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016).

"Under the *McDonnell Douglas* framework, a plaintiff must first create an inference of discrimination through her prima facie case. Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally. The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action. If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* (internal citations and quotations omitted).

1. Prima Facie Case and Legitimate Nondiscriminatory Reason

"To make a prima facie case of age discrimination [under the ADEA], the employee must show: (1) [she] was a member of the protected group between the age of forty and seventy; (2) [she] was subject to an adverse employment action; (3) a substantially younger person filled the position from which [she] was discharged; and (4) [she] was qualified to do the job from which [she] was discharged. Once an employee has established a prima facie case, the burden shifts to the employee to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015).

In this case, Nalls has satisfied her prima facie case: she was 69 years old (at the time she was fired); she was fired from her position; she was qualified to do her job; and she was replaced by a younger individual. Moreover, Corizon has offered a legitimate, nondiscriminatory reason for her firing: she directed inmates to perform nurse-related tasks. Therefore, the only question is whether Nalls has presented sufficient evidence from which a reasonable factfinder could conclude that the reasons offered by Corizon were pretextual.

2. Pretext

In her brief, Nalls refers the court to the same argument she made with respect to her disparate treatment claim for her age discrimination claim: that Corizon's stated reason for firing her—that she directed inmates to perform skilled nursing tasks—was pretextual, because Corizon was a mere cat's paw for Duffell's discriminatory animus.

However, as discussed previously, Nalls's cat's paw argument fails as a matter of law, because Nalls has not shown that Duffell's recommendation was a motivating factor behind Corizon's decision to fire her, because Corizon conducted an independent investigation into the allegations of workplace misconduct charged against Nalls and made the ultimate decision to fire her based upon its independent findings.

Moreover, Nalls's argument that Corizon's reasons for firing her were pretextual is even more tenuous—indeed, it is totally deficient—as applied to her age discrimination claim, than they were for her disparate treatment claim, because the Eleventh Circuit applies a "but-for" cause standard for causation, and not a "motivating factor" standard, in cat's paw cases involving age discrimination. *See Sims*, 704 F.3d at 1336 (11th Cir. 2013) ("Because the ADEA requires a 'but-for' link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a 'motivating factor' in the adverse employment decision, we hold that *Staub*'s 'proximate causation' standard does not apply to cat's paw cases involving age discrimination." (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). That means, Nalls must show that Duffell's discriminatory animus was the but-for cause for—or, that it had a "determinative influence" on—Corizon's ultimate decision to fire her.

Since, as discussed previously, Nalls cannot even show that Duffell's discriminatory animus resulted in Corizon's decision to fire her under the lower "motivating factor" standard, Nalls obviously does not meet her burden under the higher "but-for" causation standard.

Moreover, "the but-for cause that a biased individual recommended that the plaintiff's employment be terminated does not constitute a 'determinative cause' where 'undisputed evidence in the record supports the employer's assertion that it fired the employee for its own unbiased reasons that were sufficient in themselves to justify termination.'" *Godwin v. WellStar Health System, Inc.*, 615 Fed. App'x. 518, 529 (11th Cir. 2015) (citing *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943 (10th Cir. 2011)). The undisputed record evidence shows that Corizon fired Nalls because "Ms. Nalls delegated skilled nursing tasks onto unlicensed personnel." (Doc. # 14-7, p. 41). Accordingly, Nalls cannot show that age was a determinative— but-for—cause of her firing.

Corizon's Motion for Summary Judgment is, therefore, due to be GRANTED as to Nalls's age discrimination claim.

### D. Retaliation (Count V)

Finally, Nalls brings a retaliation claim under Title VII and the ADEA. "The Eleventh Circuit has adapted to issues of age discrimination the principles of law applicable to cases arising under the very similar provisions of Title VII." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Because Nalls's retaliation claim is based upon circumstantial evidence, the court will again employ the *McDonnell Douglas* framework, modified to the retaliation context. *See Trask*, 822 F.3d at 1193–95.

#### 1. Prima Facie Case

To establish a prima facie case of retaliation under either Title VII or the ADEA, "plaintiffs must prove that: (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Id*. at 1193–94. In this case, Corizon does not dispute the fact that Nalls engaged in a

statutorily protected activity when she complained to Duffell about calling her "Nana," or that she suffered an adverse employment action because she was fired.

Corizon argues, however, that Nalls has not met her burden of establishing a prima facie case of retaliation because she has not presented any evidence that her complaint to Duffell was causally related to her firing. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013)). The plaintiff must also show that the defendant was aware of the protected activity when taking the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Corizon argues that Nalls cannot meet either standard because (1) Nalls's firing was too remote from her complaint to Duffell and (2) Nalls cannot show that Corizon's upper management or Human Resources Department was aware of her complaint to Duffell when it made the decision to fire her.

First, Corizon argues that Nalls's claim fails because her complaint was too removed in time from her firing. Neither Corizon nor Nalls has presented any evidence showing exactly when Nalls complained to Duffell. Corizon argues that she complained "well before" she was reassigned to the infirmary—six to eight weeks before she was fired (Doc. # 15, p. 27). Nalls counters that she was transferred "immediately" after she complained (Doc. # 18, p. 31). Construing these arguments, as evidence, in the light most favorable to Nalls, the court cannot conclude that her firing was too remote from her complaint six weeks earlier. *See Young v. Honeywell Tech. Sols., Inc.*, No. 1:06CV563-SRW, 2008 WL 901441, *10 (M.D. Ala. Mar. 31, 2008) (Walker, J.) (finding an adverse employment action occurring "just over two months" after

the plaintiff's protected activity sufficient to permit an inference of causation for purposes of temporal proximity); *see also Wideman v. Walmart Stores, Inc.*, 141 F.3d 1435, 1457 (11th Cir. 1998) (one month period sufficient); *but see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing with approval decisions in which a three to four month delay was found to be insufficient).

Additionally, Corizon argues that Nalls's complaint was not a but-for cause of her firing because Corizon's upper management and Human Resources Department did not know about her complaint. "Title VII retaliation claims require proof that the protected activity was a but-for cause of the alleged adverse action by the employer." *Trask*, 822 F.3d at 1194 (internal corrections incorporated); *see also Hopkins v. Sam's West, Inc.*, 216 F. Supp. 3d 1322, 1337 (N.D. Ala. 2016) (Proctor, J.) (analyzing the causation element under the ADEA consistent with cases applying the causation element under Title VII). Nalls has not responded to that argument. Consequently, she has abandoned any argument she may have had to establish the third element of her prima facie case, and the court finds, likewise, for reasons discussed previously, that she has not satisfied her burden. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (holding a nonmovant's silence on an issue after a movant raises the issue in a summary judgment motion is construed as an abandonment of the claim.)

2. Legitimate Nondiscriminatory Reason and Pretext

Even assuming *arguendo* that Nalls's firing was causally related to the complaint she made to Duffell—and that Nalls had satisfied her prima facie case for retaliation—Nalls presented no evidence that Corizon's legitimate nondiscriminatory reason for firing her—that she directed inmates to perform skilled nursing tasks in violation of a work rule—was pretextual.

Here again, Nalls relies on her argument that Corizon's stated reason for firing her was pretextual because it was a cat's paw of Duffell's discriminatory animus.

Since Nalls relies on the same argument for pretext for purposes of her retaliation claim as she made for her disparate treatment and age discrimination claims, the court's analysis and ultimate conclusion with respect to her retaliation claim is the same. Nalls has not presented sufficient evidence to rebut the fact that Corizon acted on a good faith belief—based upon the results of its independent investigation into Nalls's alleged work rule violation—that Nalls violated a work rule. Therefore, a reasonable juror could not conclude that Duffell's discriminatory animus—to the extent she harbored any towards Nalls—motivated (for purposes of Title VII) or was a determinative influence (for the ADEA) for Corizon's decision to fire her.

Accordingly, Corizon's Motion for Summary Judgment is due to be GRANTED as to her retaliation claim.

## V. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1.  Corizon's Motion for Summary Judgment (Doc. # 14) is DENIED as to Count I;

2.  Corizon's Motion for Summary Judgment (Doc. # 14) is GRANTED as to Counts II, III, and V; and

3.  The case will proceed on the Plaintiff's claim of hostile work environment.

Done this 10th day of August, 2017.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE